Filed 11/7/13  In re Javon N.-M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAVON N.-M., a Person Coming Under the Juvenile Court Law. | B245939<br>(Los Angeles County<br>Super. Ct. No. CK94372) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>ANTHONY M.,<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County.  Valerie Skeba, Juvenile Court Referee.  Affirmed.

        Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Appellant.

        No appearance for Minor.

* * * * * *

Appellant Anthony M. (Father) appeals from the juvenile court's jurisdiction order sustaining a dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b)[1] and a disposition order declaring the child Javon N. a dependent of the court and placing him with a relative. The Los Angeles County Department of Children and Family Services (Department) appeals from the jurisdiction order. We affirm. Substantial evidence supported both the juvenile court's jurisdictional findings and disposition order, as well as its modifications to the dependency petition to conform to proof.

## FACTUAL AND PROCEDURAL BACKGROUND

### Facts Preceding Detention.

T.N. (Mother) and Father are the parents of Javon, born in March 2009; S.N., born in April 2001, is his half-brother. Mother and S.N. first came to the attention of the Department in October 2004 when Mother was found sleeping with S.N. in a parked car. There were no allegations of abuse, and S.N. was found to be well cared for in the home of maternal grandmother Kimberly N. (MGM). In November 2008 and February 2009, and again in September 2010 after Javon was born, allegations of Mother's physical abuse against S.N. were determined to be unfounded. In May 2011, though allegations of physical abuse and general neglect by Mother were deemed unfounded, an allegation of caretaker abuse was substantiated and the family participated in voluntary family maintenance (VFM) services between August 2011 and June 2012.

The family came to the Department's attention again on October 12, 2012 when a referral reported that Mother had been arrested for ramming her vehicle into Father's vehicle in front of an elementary school. A social worker investigated, interviewing a deputy who had received a report about the incident from Father. According to the deputy, Father reported that Mother had a child in the car with her, and after he and Mother had a verbal altercation over her seeing Father's girlfriend in his vehicle, Mother

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

2

intentionally hit his car twice with her car. The deputy observed dents and scratches on Father's vehicle. The same deputy interviewed Mother, who stated she unintentionally hit Father's car once and did not recall hitting it a second time. She confirmed that S.N. was in her car during the incident. Javon was not in the car.

In an interview with the social worker, S.N. stated that Mother and Father had separated one week earlier. He had heard Mother and Father frequently argue in their bedroom and had observed them throw and break things during arguments. He had never observed any physical violence between them, nor had he ever been physically abused. With respect to Mother's arrest, he stated that Mother had picked him up from school and, because it was raining, invited Father's daughter Tiarra to wait in her car until Father arrived. When Father arrived, he and Mother argued while sitting in their vehicles. When Father got out of his car, Mother proceeded to hit Father's vehicle with hers, and then turned around at the end of the street and hit his vehicle again.

The social worker interviewed Mother in jail, who reported to be suffering autoimmune hepatitis and liver failure from being two months pregnant. She stated that she had stopped using corporal punishment, but that she and Father on occasion verbally abused the children. For example, when S.N. received a "D" on his report card she asked him if that meant "dummy." She stated she and Father had known each other for eight years, and that the domestic violence between them had begun when she was pregnant with Javon. She stated that Father had punched her in the face, choked her, pushed her, grabbed and thrown her and pinned her to the ground. She also stated that he had raped her on multiple occasions. On one occasion he threw coins at her face, resulting in a swollen eye. Though she had contacted law enforcement a few times to "keep the peace," she never reported the domestic violence. She admitted both she and Father would throw and break things, though she denied that any domestic violence had occurred in front of the children. Mother also reported a history of mental health issues. In connection with the incident leading to her arrest, her account of the initial argument was similar to S.N.'s; she stated, however, that she unintentionally hit Father's car while pulling away and had no recollection of hitting the car a second time.

3

S.N.'s father reported that Mother uses S.N. as a pawn and that he would like S.N. to live with him. Though stating that Mother has been a good parent to S.N., he reported that Mother had a history of alcohol abuse and mental health issues, and stated that the two separated following an incident where Mother threatened to hit him. He stated that because Mother had denied him visitation with S.N., he had been visiting him through relatives and also providing money for him through the same relatives without Mother's knowledge. Mother stated that S.N.'s father was a liar and did not provide for S.N., and that she would rather have Father care for S.N.

The social worker also interviewed the MGM, who knew that Mother and Father verbally argued but was unaware of any domestic violence.

The Department detained the children, placing S.N. with his father and Javon with the MGM.

### Section 300 Petition.

The Department filed a section 300 petition, alleging under subdivisions (a) and (b) that Mother and Father had a history of domestic violence and engaging in violent altercations that endangered the children's health and safety and placed them at risk of harm. The petition identified specific altercations, including Mother's striking Father's vehicle with her vehicle; Father's punching, choking, pushing and forcibly raping Mother; and Father's throwing coins at Mother causing a swollen eye.

At the October 17, 2012 detention hearing, the juvenile court denied Father's request to have Javon released to him. Citing the evidence of domestic violence, the juvenile court ordered both children detained in their respective placements and allowed Mother and Father monitored visitation. It gave the Department discretion to liberalize Father's visits and to release Javon to him. At Father's request, the juvenile court also issued a temporary restraining order against Mother.

### The Department's Reports.

The Department's November 2012 jurisdiction/disposition report attached an incident report prepared by the Los Angeles County Sheriff's Department. According to the incident report, in addition to Father and S.N., Tiarra and Father's girlfriend Jennifer

4

also stated they witnessed Mother intentionally sideswipe Father's car twice. Mother maintained the first collision was accidental and did not remember a second collision. As a result of the incident, Mother was charged with felony assault with a deadly weapon and felony vandalism.

The social worker reinterviewed S.N. He reiterated that Mother had intentionally crashed her car into Father's, but added: "'It's his [] fault for cheating on my mom. That's what he gets. My mom hit his car twice. They would argue every day about stupid stuff. They would yell in each other's face. [Father] would tell my mom "I will hit you" every day but I never saw him hit my mom. He never touched her. My mom was the one that would throw things. My brother would be near by when that happened.'" He added: "'Everything was ok before [Father] came along. They [Mother and Father] would fight about everything like little children.'" He was happy in his placement with his father. S.N.'s father had never observed domestic violence between Mother and Father, but both he and another relative had noticed that Mother looked haggard and disheveled on occasion.

In a further interview with Mother, she reported that Father first raped her in 2008. The two only verbally argued from that time until February 2012 when Father was released from jail after being arrested for driving under the influence; at that time he resumed raping and punching her. She noticed the incidents occurred primarily when Father would drink. She described a particular incident in March 2012 when he threw coins at her face. Though she contacted the police, she lied about why her eye was swollen. She also described an incident in early May 2012 when she and Father were driving home from a concert. Mother was driving because Father had been drinking, but the two began arguing when she got lost. She pulled over when Father "busted" the car windows, and Father began punching her when she crawled in the back seat because she was not feeling well. Mother said her current pregnancy was the result of Father forcing her to have sex with him.

The Department characterized the future risk of abuse and neglect of the children as "high," noting that multiple witnesses confirmed Mother intentionally hit Father's car;

5

Mother alleged repeated rapes and other violence by Father; Father had been arrested for driving under the influence and Mother reported his violence worsened when he drank; and S.N. reported Mother and Father argued every day. It recommended that the children be declared dependents of the court, that Mother and Father receive reunification services and that the children remain suitably placed.

An addendum report contained interviews with Javon and Father. Though Javon was verbal, he could not provide a meaningful statement about the petition's allegations. He did state that Mother and Father would "'fight.'" Father denied all reported incidents of violence with Mother except for Mother's hitting his car. He admitted to being arrested in July 2012 for driving under the influence and being placed on summary probation,[2] but he stated he was wrongfully charged as a result of an officer forcing him to take a breathalyzer test multiple times. He also stated he was found as a failure to appear because he did not pay his attorney. He desired custody of Javon, noting that visitation had been difficult since the MGM did not like him. The MGM reported that Father had not seen Javon or tried to call him since the detention hearing.

The Department also interviewed Father's ex-wife and the mother of his daughters. She reported that she separated from Father in 2008; she discovered he was cheating on her and stabbed him in the arm. She was arrested and while she was in jail, Father obtained custody of the girls. She regained physical custody of them in October 2012. The two girls reported that Mother and Father were constantly yelling at each other, but they denied witnessing any physical altercations between the two of them.

For the December 6, 2012 jurisdiction/disposition hearing, the Department also submitted a multidisciplinary assessment team summary of findings. The assessor was unable to interview Father, as he failed to call or attend a scheduled meeting. The assessment indicated that Javon was doing well in his placement with the MGM.

---

**2**    Mother asserted the arrest occurred in February 2012. Moreover, though Father stated he received probation, the record contains no evidence of a conviction for driving under the influence.

6

*Jurisdiction/Disposition Hearing.*

The juvenile court received the Department's reports into evidence at the beginning of the jurisdiction/disposition hearing.[3] Mother testified first. She declined to answer certain questions about hitting Father's car on the ground her answers may incriminate her.[4] She testified that there had been domestic violence in her relationship with Father, with the first incident occurring in 2008 and resulting in a restraining order against Father. The most recent incident occurred in September 2012 when Father forced her to have sex with him and threw things around the garage. She stated she telephoned the Sheriff's Department, but they refused to send anyone unless she could identify damage to the garage. She described other incidents where Father threw items at her, beat her while she was in the back seat of a vehicle and pinned her to the ground. She stated she had called the police four times in 2012 as a result of this violence, and that the police had come to her house at least once. She did not tell the police about any sexual abuse. She believed Father was under the influence of alcohol during all these incidents and was unsure whether the children had witnessed any of them. She further stated that Father had moved out in October 2012 but saw Javon when he would come over to visit.

Mother conceded that Father had been a good provider for his daughters. She identified two incidents, however, where Father hit one of his daughters. The first time, Father slapped his daughter across the face after she informed Mother he had been cheating on her; Mother only observed the aftermath of the second time, seeing the daughter with facial bruises and a cut lip. Mother did not contact the police or the Department as a result of these incidents. She added that Father treated Javon differently than his daughters, possibly because he had a hyphenated last name. She also stated that S.N. recently confirmed to her that Father had hit him with a belt in September 2012.

---

[3] The trial court granted mutual restraining orders during the hearing.

[4] Mother's criminal trial was set for December 13, 2012.

Father testified that he and Mother had verbal altercations during their five-year relationship, but denied any physical violence or rape. According to Father's version of the 2008 incident, he had gone over to Mother's home to break up with her because he was married, but the two ended up having consensual sex. When he then tried to break up with her, she became angry and threw things at him. Also according to Father, someone else then vandalized Mother's home the following day, but because Mother was angry with Father she blamed the vandalism on him. He stated that the two resumed their relationship sometime after that. He admitted that Mother had called the police three or four times, though he had never been arrested.

Father testified that he drinks alcohol rarely—approximately once per month. He denied drinking to the point of intoxication and denied that he had been drinking when he was arrested for driving under the influence. He complained that the breathalyzer machine was not working and the police refused his request to see a supervisor.

He described the incident where Mother hit his car. He noted that he did not call the police about Mother hitting his car; his tires were slashed the following day and in connection with the investigation of that incident he told the officers about Mother's conduct the previous day. He also indicated that on the night the two drove home from a concert they had both been drinking and that Mother—not he—kicked out the back window of the car. He denied any physical abuse of his daughters; he stated Mother had hit one of them once. He stated he had been arrested once for domestic violence involving another individual, but he was not the aggressor.

Father also testified that he had not seen Javon because no one returned his calls, he only recently received the MGM's telephone number and there had been some issue with the MGM's living arrangements.

All parties rested after Father's testimony. The juvenile court stated that it did not want to hear closing arguments, as it did not think they would be particularly helpful. It further stated that it did not find Father to be very credible and found Mother to be only a little more credible. It believed that some of the incidents Mother described had happened, but it did not believe that Father had been assaulted by two different women.

8

It characterized Mother and Father as having an "extremely conflicted and toxic relationship," and observed "I see parents who basically have little control over themselves and they take their frustration and anger out on each other."

The juvenile court was also critical of the Department's investigation, noting that Father had testified about an arrest for domestic violence and the social worker failed to provide any records regarding that claim. It further noted that the Department failed to follow up with any of the individuals with whom Mother had discussed Father's assaults.

With respect to jurisdiction, the juvenile court stated: "I do believe that there's a substantial amount of verbal abuse going on as well as physical abuse and I think probably both parents were the aggressors. And I think that while the children may not have seen all of the physical abuse or even most of it, I think there's certainly enough evidence they heard the after effects which is the screaming and yelling and swearing and throwing of things that went on in the home. All right. Since I don't have a clear determination of exactly what went on, I'm going to strike much of the details from the (a) count and (b) count and however I do believe very clearly very certainly that there was domestic violence going on." It sustained the petition as modified, and declared the children dependents of the court pursuant to section 300, subdivisions (a) and (b).

Proceeding to disposition, the juvenile found by clear and convincing evidence that a substantial danger existed to the physical health of the children and there existed no reasonable means to protect them absent removal from Mother and Father. It ordered that Javon remain suitably placed.[5] It further ordered Father to participate in domestic violence counseling and individual counseling to address anger management and substance abuse issues. It permitted him monitored visitation with Javon, with the Department having discretion to liberalize.

Father and the Department appealed.

---

[5] The juvenile court released S.N. to his father and terminated jurisdiction over him with a family law order.

9

## DISCUSSION

Father contends substantial evidence did not support the juvenile court's jurisdiction and disposition orders, while the Department maintains substantial evidence did not support the juvenile court's modifications to the section 300 petition. We find no merit to either party's contentions.

## I. Standard of Review.

We review the juvenile court's jurisdiction and disposition orders for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) Under this standard, we review the record to determine whether there is any reasonable, credible, and solid evidence to support the juvenile court's conclusions; we resolve all conflicts in the evidence and make all reasonable inferences from the evidence in support of the orders. (*In re J.K., supra*, at p. 1433; *In re Christina A.* (1989) 213 Cal.App.3d 1073, 1080.) "'Issues of fact and credibility are questions for the trial court.' [Citations.] It is not an appellate court's function, in short, to redetermine the facts. [Citation.]" (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)

## II. Father's Appeal.

### A. *Substantial Evidence Supported the Jurisdiction Order.*

The juvenile court declared Javon a dependent of the court under section 300, subdivisions (a) and (b). If either count is sufficient to support jurisdiction, we must affirm. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) Because we conclude that jurisdiction was appropriate under section 300, subdivision (b), we need not consider whether jurisdiction was also supported under section 300, subdivision (a). (*In re Alexis E., supra*, at p. 451.)

A child may be declared a dependent under section 300, subdivision (b) if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." A petition filed under section 300, subdivision (b) must contain the following elements: "'(1) neglectful conduct by the

10

parent in one of the specified forms [. . . such as a parent's failure to adequately supervise or protect a minor]; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.'"  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)

"[D]omestic violence in the same household where children are living *is* neglect" that constitutes a failure to protect the children "from the substantial risk of encountering the violence and suffering serious physical harm or illness from it."  (*In re Heather A., supra,* 52 Cal.App.4th at p. 194.)  Citing both *In re Heather A.* and a series of studies on the detrimental effects of domestic violence on children, the court in *In re R.C.* (2012) 210 Cal.App.4th 930, 941, recently explained that "[e]xposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)."  Such "'[c]hildren can be "put in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot, or leg. . . ."  [Citation.]'"  (*Id.* at pp. 941–942.)  But ""'"even if they are not physically harmed, children suffer enormously from simply witnessing the violence between their parents. . . ."'""  (*Id.* at p. 942; accord, *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562 [observing that domestic violence is detrimental to children]; *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5 [same].)  The *In re R.C.* court found evidence of domestic violence in the form of the father's breaking the mother's cell phone, pushing her down and choking her, and verbally threatening her constituted substantial evidence supporting a jurisdictional finding under section 300, subdivision (b), even though the child witnessed only one incident and was not physically harmed.  (*In re R.C., supra,* at p. 943.)

Here, there was substantial evidence that Javon remained at risk from Mother's and Father's domestic violence.  Mother and Father both admitted that the police had been called on multiple occasions as a result of altercations between the two of them.  They both admitted to having an altercation in their car which resulted in the windows being shattered.  They both acknowledged that Mother would throw things when the two fought.  S.N. stated that Mother and Father argued with each other every day, yelling in

11

each other's faces. On multiple occasions, he heard Father tell Mother that he would "hit her." He added that Javon was frequently nearby when the two would argue. Most recently, S.N. observed Mother's and Father's argument result on Mother intentionally crashing her car into Father's. As in *In re John M.* (2013) 217 Cal.App.4th 410, 419, "[t]he parents' history of domestic violence evidences an ongoing pattern that, while not yet causing harm to J[avon], presented a very real risk to J[avon's] physical and emotional health. Both parents hit each other; verbal altercations were frequent; and father engaged in reckless driving with mother in the car." (See also *In re T.V.* (2013) 217 Cal.App.4th 126, 134 ["Although T.V. was not present at the time, the domestic violence between the parents was ongoing and likely to continue, thus placing T.V. at substantial risk of physical harm"].)

Father argues the evidence was insufficient to support jurisdiction because Mother was not credible. He contends the juvenile court therefore should have disregarded her accounts of Father's violent behavior. He maintains that evidence of the October 2012 automobile incident, which was not based on Mother's testimony, failed to show how Javon remained at a current risk from Father.

The fundamental premise of Father's contention requires that we make a credibility determination—a task reserved for the juvenile court. We may not reweigh the evidence, independently evaluate the credibility of witnesses and resolve conflicts in the evidence. (See *In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) In any event, even if we were to disregard Mother's statements, S.N.'s observations of Mother and Father constantly yelling at each other, throwing things at one another and arguing near Javon would be sufficient to constitute substantial evidence of an ongoing risk to Javon. (See *In re Heather A., supra,* 52 Cal.App.4th at p. 192 [domestic violence affects children even if they are not the ones being physically abused "because they see and hear the violence and the screaming"].)

Nor are we persuaded that the evidence was insufficient to show Javon was at a present risk from domestic violence. Though Mother and Father stopped living together sometime in October 2012, Father testified that he and Mother had broken up previously,

12

but resumed their relationship even after she threw a game at him and a barstool at a television he gave her, and after she had called the police to obtain a restraining order against him and to report vandalism he contended he did not commit. On the basis of this evidence, the juvenile court could reasonably infer that the automobile incident was not the conclusion of Mother's and Father's relationship. (See *In re S. O.* (2002) 103 Cal.App.4th 453, 461 ["'past conduct may be probative of current conditions' if there is reason to believe that the conduct will continue"].) Moreover, the juvenile court received evidence from both Mother and Father that violent incidents would tend to occur after Father had been drinking. Yet, Father denied drinking alcohol to the point of intoxication, even though he had been arrested and placed on probation for driving under the influence. Father's failure to acknowledge at least one impetus for his altercations with Mother was also evidence of a current risk of harm.

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. [Citations.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "'The purpose of dependency proceedings is to prevent risk, not ignore it.' [Citation.]" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) Substantial evidence that Javon remained at risk supported the juvenile court's assumption of jurisdiction over him.

### B.    *Substantial Evidence Supported the Disposition Order.*

The juvenile court removed Javon from Father's custody. While the juvenile court made removal findings as to Mother during the hearing, the court proceeded immediately to ordering reunification services as to Father. The minute order for the disposition hearing, however, specified that the juvenile court made removal findings for Father. "'[W]hether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' [Citation.]" (*In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1136.) And

13

when possible, the clerk's minutes and the reporter's transcript should be harmonized. (*In re Byron B.* (2004) 119 Cal.App.4th 1013, 1018.) Where, as here, "the clerk's transcript simply clarifies a point that the reporter's transcript left ambiguous," "[w]e conclude that the minute order correctly recites the juvenile court's ruling." (*Ibid*.)

Though he did not challenge the disposition order below, on appeal Father contends the evidence was insufficient to support removal.[6] Section 361 authorizes the removal of a child from a parent's physical custody if the juvenile court finds that a substantial danger exists to the child's physical or emotional well-being: "A dependent child may not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c)(1).)

Substantial evidence supported the juvenile court's disposition order removing Javon from Father's custody. A removal order is proper if it is based on evidence of parental inability to provide proper care for the child and evidence of a potential detriment to the child if he or she remains with the parent. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) A parent's level of denial is an appropriate factor to consider when determining the risk to the child if placed with that parent. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [noting "denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].) The parent need not be dangerous and the child need not actually

---

[6] Although the evidence suggested that Father was not living with Javon at the time of disposition, Father has forfeited any placement claim pursuant to section 361.2 as a noncustodial parent by failing to raise the issue at the hearing. (*In re John M.* (2013) 217 Cal.App.4th 410, 419; *In re A.A.* (2012) 203 Cal.App.4th 597, 605.) In any event, section 361.2 applies only to a noncustodial and a nonoffending parent. (*In re John M., supra,* at pp. 420–424.)

have been harmed before removal is appropriate; the focus of the statute is on averting harm to the child. (*In re Diamond H., supra,* at p. 1136.)

Here, at the time of the disposition hearing, Father took no responsibility for exposing Javon to domestic violence. He continued to deny he had been involved in domestic violence (except as a victim) and denied that his alcohol consumption contributed in any way to the incidents of violence. S.N., on the other hand, explained how "'[e]verything was ok before [Father] came along,'" and described Mother's and Father's constant arguing, sometimes in the presence of Javon. Young Javon knew that Mother and Father would "'fight.'" There was substantial evidence to support the juvenile court's finding that until Father received domestic violence counseling and addressed his anger management and substance abuse issues, there were no reasonable alternatives to removal to protect Javon.

## III.  The Department's Appeal.

The Department contends substantial evidence did not support the juvenile court's amending the section 300 petition by striking any reference to specific incidents of violence, including Mother's hitting Father's car on October 12, 2012; Father's punching Mother's face and choking her; Father's grabbing Mother's arm, pushing her and pinning her down; Father's raping Mother; and Father's throwing coins into Mother's face causing a swollen eye.

The juvenile court explained the reasons for the modifications, stating that it found much of Father's testimony and some of Mother's lacked credibility, and for that reason it did not have a "clear determination of exactly what went on . . . ." It did find, however, that there was sufficient evidence of "screaming and yelling and swearing and throwing of things that went on in the home" supporting the allegations that Mother's and Father's history of domestic violence and violent altercations placed S.N. and Javon at risk. It also expressly observed that one of the reasons it lacked credible evidence of specific incidents was the Department's inadequate investigation. After criticizing the Department's failure to obtain Father's arrest record, get Sheriff's Department records concerning domestic violence calls and interview witnesses about Mother's statements

15

and condition, the juvenile court admonished the social worker that "it's not acceptable to present this type of case."

A juvenile court may amend a dependency petition to conform to the evidence received at the jurisdiction hearing in order to remedy immaterial variances between the petition and proof. (§ 348; Code Civ. Proc., § 470.) "No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits." (Code Civ. Proc., § 469.)

"[T]he ability to amend according to proof plays an important role in the overall dependency scheme. If a variance between pleading and proof—to use the traditional term of art from the civil law [citation]—is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment. [¶] The basic rule from civil law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice. [Citation.]" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042, fn. omitted.)

Here, the Department has failed to demonstrate how it was misled to its prejudice by the amendments. The juvenile court modified the petition to conform to the evidence and struck allegations it found were unsupported due to Mother's and Father's lack of credibility as well as the Department's poor investigation. Substantial evidence supported the juvenile court's amending the petition to conform to proof.

16

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. \*

                   FERNS

We concur:




_____, P. J.

     BOREN




_____, J.

     CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.